## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| S.B., a Minor Student, | ) | |
| by and through her parents Sc.B. | ) | |
| and R.B., and Sc.B. and R.B., | ) | |
| individually, | ) | |
| | ) | CASE NO:_____ |
| Plaintiffs | ) | |
| | ) | |
| COLLIERVILLE SCHOOLS | ) | JURY DEMANDED |
| BOARD OF EDUCATION | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |

---

## COMPLAINT

---

COME THE PLAINTIFFS, S.B., a minor student, by and through her parents Sc.B. and R.B, and Sc.B. and R.B., individually, and file this Complaint against the Defendant, **COLLIERVILLE SCHOOLS BOARD OF EDUCATION.**  They show:

## I.   INTRODUCTION

1.      This action is brought by S.B. a minor student, by and through her parents, Sc.B. and R.B. and Sc.B. and R.B., individually.  Sc.B.'s and R.B.'s ("Parents") daughter S.B., is a 12-year-old student who just completed her sixth-grade year at Collierville Middle School.

2.      Plaintiffs bring this action to challenge discrimination and retaliation by Defendant Collierville Schools Board of Education ("Collierville Schools") against S.B., a student with a disability.

3.      Plaintiffs bring this action under Title II of the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq.* ("ADA"), amended by the Americans with Disabilities Act (ADA-AA) with an effective date of January 1, 2009, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 *et seq.* ("Section 504"), including the conforming amendment of the ADA-AA which changes the definition of "disability" under §504 to conform to the definition of "disability" under ADA-AA, and the First Amendment to the United States Constitution and 42 U.S.C. §1983.

4.      S.B. attended Collierville Middle School for sixth grade (the 2016-2017 school year) under the terms of a Section 504 Student Services Plan ("504 Plan").  S.B.'s 504 Plan recognized that S.B. has Type I diabetes which impacts her ability to focus and concentrate and causes her to miss class time due to monitoring and treatment of her diabetes.

5.      Since being diagnosed with Type I diabetes in the summer of 2014, S.B. has worked very hard to manage the medical care and complications from her diabetes with the rigor of her school requirements.   Accordingly, S.B. is an average performing student who makes a mixture of A's, B's, and C's and who occasionally experiences diabetes-related absences due to her illness or treatment requirements.

6.      S.B. has resided at her same home in Collierville, Tennessee located in an area known as the "Reserve" since 2008.  However, S.B. was subjected to an "annexation" by Shelby County Schools prior to the start of her fourth-grade year (2014-2015 school year).  Despite the annexation, S.B., like approximately 150 other Collierville students who live in the Reserve area and who were annexed into Shelby County Schools, was permitted to remain in Collierville Schools as a "transfer" student.

7.     When S.B. began her sixth-grade year and transitioned from Tara Oaks Elementary to Collierville Middle School, S.B.'s parents advocated on her behalf to attend school with her privately acquired diabetic service alert dog, Brody, which after some initial pushback, was ultimately approved by Collierville Schools.

8.     Additionally, mid-way through S.B.'s sixth-grade year, S.B.'s mother advocated on multiple occasions for S.B. to receive an Individualized Education Program ("IEP") pursuant to the Individuals with Disabilities in Education Act ("IDEA"), but her requests were denied or ignored by Collierville Schools.

9.      At the end of S.B.'s sixth-grade year, in May 2017, Plaintiffs were notified by Collierville Schools that S.B.'s transfer status was suddenly rescinded on the alleged basis that S.B. had not met Collierville Schools' "policy" regarding transfer students.

10.    Collierville Schools initially told Plaintiffs that the basis for the rescission of S.B.'s transfer was that S.B.'s attendance was "unsatisfactory."   In subsequent conversations with Plaintiffs, Collierville Schools later added that it also deemed S.B.'s academic performance "unsatisfactory."

11.    However, neither S.B.'s attendance, nor her academic performance, were significantly different than prior years when she was permitted to attend Collierville Schools as transfer student.  Furthermore, as explained to the school by S.B.'s parents, and contemplated by her 504 Plan's accommodations of making up missed assignments, quizzes and tests, S.B.'s Type I diabetes causes diabetes-related complications and illnesses (i.e. impaired cognition and concentration and absences from school).

12.    Thus, by rescinding S.B.'s transfer, Collierville Schools has violated Section 504 and the ADA by discriminating against S.B. on the basis of her disability, refusing to

accommodate S.B.'s disability-related absences, and imposing a punishment on her not imposed similarly on her nondisabled or differently disabled peers.

13.     Moreover, the proximity in time between Plaintiffs' advocacy on S.B.'s behalf during her sixth-grade year (i.e. to permit S.B. to have a diabetic alert service dog and an IEP for further supports and services) and Collierville Schools' sudden rescission of her transfer status without any warning or meeting with Plaintiffs, indicates that Defendant's decision represents impermissible retaliation under Section 504, the ADA, and United States Constitution against Plaintiffs for Plaintiffs' protected activity.

## II.   PARTIES, JURISDICTION, AND VENUE

14.     Plaintiffs, **Sc.B., R.B, and S.B.** ("Plaintiffs")[1] are citizens and residents of Collierville, Tennessee.

15.     S.B. is a protected student with a disability under Section 504, 29 U.S.C. §794, *et seq.* and the ADA, 42 U.S.C.§ 12101, *et seq.*, in that she has impairments which substantially limit her in major life activities, including but not limited to endocrine, excretory, and digestive system functioning as well as focusing and concentrating.

16.     Defendant, **COLLIERVILLE SCHOOLS BOARD OF EDUCATION**, ("Collierville Schools") has offices at 146 College Street, Collierville, Tennessee 38017. Collierville Schools is a recipient of federal financial assistance within the meaning of Section 504, 29 U.S.C.§ 794(b)(2)(B) and is a "public entity" as defined by the ADA, 42 U.S.C.§ 12131(1).   Accordingly, Collierville Schools is responsible for upholding the

---

[1]     Although known to Defendant, Plaintiffs are not expressly named herein by their given names because S.B. is a minor whose privacy guarantees are provided in Fed. R. Civ. P. 5.2(a)(3).

rights of children and their parents under Section 504 and the ADA.

17.    Collierville Schools is also an employer operating in Shelby County, Tennessee who, acting under color of law, deprived Plaintiffs of Constitutional rights as set forth herein below.

18.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

19.    Venue is proper because the alleged acts in this lawsuit occurred in this judicial district and/or because the Defendant conducts business in this judicial district.

### III.    FACTUAL BASIS FOR SUIT

#### A.    S.B. Attends Collierville Schools as a Transfer Student after a 2014 Rezoning

20.    Public schools located in Collierville, Tennessee are well-known throughout the State of Tennessee for being high-achieving schools where parents seek to send their children.

21.    Accordingly, in 2008, S.B.'s parents purchased a home in an area of Collierville known as the Collierville Reserve, specifically because the home was zoned for schools located within Collierville, which were then a part of the larger Shelby County School system.

22.    S.B. subsequently began Kindergarten in Collierville at Tara Oaks Elementary where she remained a student through her 5th grade year in 2015-2016.

23.    In 2014, the schools located within Collierville separated from Shelby County Schools to form their own municipal school district, Collierville Schools.  As part of that restructuring, Shelby County "annexed" a number of students with Collierville addresses, including S.B., who were originally zoned for schools located within the

newly formed Collierville Schools system and rezoned those students for Shelby County Schools. S.B.'s rezoning into Shelby County Schools would require her to attend an inferior performing school as compared to the Collierville Schools she had previously been zoned to.

24.     Discussing the rezoning of a certain number of children with Collierville addresses to Shelby County Schools, including S.B., Collierville Mayor Stan Joyner addressed his citizens stating to the press, that despite the "annexation" by Shelby County of these students, students with Collierville addresses would still be allowed to attend Collierville Schools. Specifically, Mayor Joyner stated: "We've got children who live in Memphis' annexation reserve area at Houston Levee all the way over to north of Winchester . . . . We don't have a problem with that. We have capacity for those children. This is where they started school. This is where they can continue."

25.     Consequently, despite the rezoning and "annexation" of S.B.'s Collierville address into Shelby County Schools in 2014, S.B. was permitted to remain at Tara Oaks Elementary in the newly formed Collierville Schools system as a "transfer" student throughout her elementary career.

26.     For the 2016-2017 school year, S.B. was also permitted to attend Collierville Middle School (her zoned school prior to the 2014 annexation by Shelby County) as a "transfer" student.

27.     Upon information and belief, there are over 150 students located in the Collierville Reserve area where S.B. resides who are now zoned for Shelby County Schools, but who are permitted to attend Collierville Schools (the schools to which they were originally zoned prior to the 2014 annexation) as transfer students.

6

**B.     4th-5th Grade (2014-2016): S.B. is Diagnosed with Type I Diabetes and Requires a 504 Plan with Accommodations**

28.     According to the Center for Disease Control (CDC), Type 1 diabetes, the most common form of diabetes in young people, is an autoimmune disease in which a person's pancreas stops producing insulin, a hormone that enables people to get energy from food.  Type I diabetes occurs when the body's immune system attacks and destroys the insulin-producing cells in the pancreas, called beta cells.

29.     Type I diabetes diagnoses are on the rise across the nation, particularly among youth under 20.  It is estimated that over 200,000 youth under age 20 are currently diagnosed with Type I diabetes.  And while the causes of Type 1 diabetes are still unknown, in a study funded by the CDC, it was found "that from 2002 to 2012, incidence, or the rate of new diagnosed cases of type 1 diabetes in youth increased by about 1.8 percent each year," or at a rate of about 18,000 new Type I diagnoses for youth under the age of 20 per year.  Rates of new diagnosed cases of type 1 and type 2 diabetes on the rise among children, teens, *available at* https://www.cdc.gov/media/releases/2017/p0412-diabtes-rates.html (last visited August 14, 2017) 2014 Diabetes Report Card, *available at* https://www.cdc.gov/diabetes/pdfs/library/diabetesreportcard2014.pdf (last visited August 14, 2017).

30.     Though a person can develop Type I diabetes at any age, the most common age for diagnosis is the middle teen years.   And while it remains unknown what exactly causes Type I diabetes, researchers have determined it has nothing to do with a person's lifestyle or diet, and thus, there is nothing known which can be done to prevent the onset of the disease.  *Id.*  Accordingly, Type I diabetes remains a disease that comes

on suddenly, causes dependence on injected or pumped insulin for life, and carries the constant threat of devastating complications, with diabetes listed as the seventh leading cause of death in the nation. *Id.* Consequently, this generation's educational leaders' attitudes toward the challenges and cautions faced by individuals diagnosed with Type I diabetes is extremely important.

31. Plaintiffs' daughter, S.B., is a minor who is currently 11 years old and is diagnosed with Type 1 diabetes, Anxiety, and ADHD.[2]

32. S.B.'s Type I diabetes, alone, substantially impairs her major life activities of properly functioning endocrine, excretory, and digestive systems as well as her ability to focus and concentrate. Accordingly, S.B. is a person with a disability as that term of art is defined within the meaning of the ADA and Section 504.

33. S.B. was originally diagnosed with Type I diabetes in June 2014 when she was just 9 years old and entering the 4th grade at Tara Oaks Elementary School as a transfer student within Collierville Schools.

34. Because of S.B.'s Type I diabetes, her blood sugar may change dramatically within a matter of minutes, which can result in life threating conditions including diabetic ketoacidosis (a serious complication of diabetes that occurs when your body produces high levels of blood acids called ketones) and diabetic coma.

35. Furthermore, problems with S.B.'s blood sugar regulation can cause additional adverse health conditions, including reduced immune system functioning causing her

---

[2]    However, due to S.B.'s Type I diabetes and the result it has on how she metastasizes medication, she is unable to take medication to help alleviate her ADHD symptoms.

8

to be more susceptible to illness and taking longer than others to recover from illnesses. In addition, when S.B. is experiencing blood sugar fluctuations (highs or lows), she can experience fatigue, confusion, and dizziness.

36.    S.B.'s Type I diabetes causes her particular difficulty in the morning hours as she experiences what individuals with Type I diabetes refer to as "Dawn Phenomenon," where S.B.'s blood sugar plummets to severe lows (in the 40's range) in the early morning hours around 4 a.m. and then suddenly spikes to severe highs (in the 400's range) around 6 a.m.

37.    Accordingly, S.B.'s fragile condition, still fairly recently diagnosed to S.B. and her family, requires timely administration and accurate insulin therapy for S.B.'s survival and to minimize risk of diabetic ketoacidosis, diabetic coma, and other adverse health conditions.

38.    Consequently, at all times material hereto, Collierville Schools recognized S.B. as a protected person with a disability and issued her a Section 504 Student Services Plan (504 Plan) that provides for various accommodations for her Type I diabetes.

39.    S.B.'s 504 Plan was developed in 4th grade (2014-2015) when she was first diagnosed with Type I diabetes.  Her 504 Plan acknowledges how her Type I diabetes requires her to miss class time for diabetes related care and management as well as how her fluctuating blood sugar levels negatively affect her cognition and concentration.  Therefore, S.B.'s 504 Plan provides for her to have missed instruction redelivered, to be provided with missed notes, to receive abbreviated assignments, and to receive extra time to complete assignments, quizzes, and/or tests.

40.    S.B.'s school, Tara Elementary, worked with S.B. during her fourth-grade year

9

(2014-2015) to accommodate her adjustment to living with Type I diabetes as well as the effect it had on her ability to attend school.

41.     During her fourth-grade year, S.B. made a mixture of A's, B's, and C's in her classes and had four (4) excused absences and seven (7) unexcused absences.

42.     S.B. was granted transfer status to continue attending Tara Elementary in Collierville Schools for her fifth-grade year (2015-2016).

43.     And like her fourth-grade year, during S.B.'s fifth-grade year (2015-2016), Tara Elementary continued S.B.'s 504 Plan and worked well with S.B. to accommodate her Type I diabetes.

44.     During her fifth-grade year, S.B. made A's, B's and C's in her classes with a 2.63 cumulative GPA and had four (4) excused absences and six (6) unexcused absences.

### C.     6th Grade (2016-2017): Plaintiffs' Advocate for S.B.'s Federally Protected Rights Under Section 504/ADA and IDEA

45.     To ensure that S.B.'s blood sugar was being properly controlled, and to provide early detection of any change in blood sugar, towards the end of S.B.'s 5th-grade year, S.B.'s parents privately obtained a $12,000.00 diabetic alert service dog named "Brody." Brody is specially trained to detect and give warning of changes in blood sugar in S.B. so that she can quickly get treatment.

46.     For sixth grade (2016-2017), S.B. had again been granted transfer status to attend Collierville Schools and was assigned to Collierville Middle School.

47.     In the summer of 2016, and prior to the start of S.B.'s 6th-grade year at Collierville Middle School, S.B.'s parents notified Collierville Schools that Brody would need to accompany S.B. to school.

48.   Collierville Schools was initially hesitant to permit Brody to attend school with S.B.  Nevertheless, after consistent advocacy by S.B.'s parents to explain to Collierville Schools the importance and necessity of allowing a diabetic alert service dog to accompany a child with Type I diabetes, Collierville Schools eventually agreed to allow Brody's attendance.

49.   Permitting Brody to accompany S.B. to school, however, required multiple meetings and the involvement of an attorney for Collierville Schools because S.B.'s diabetic alert service dog was the first service dog to attend Collierville Middle School.

50.   Collierville Schools formulated a Service Dog Plan, signed on August 12, 2016 and attached the Service Dog Plan to S.B.'s 504 Plan, attached hereto as **Exhibit A**.

51.   S.B.'s Service Dog Plan called for Collierville Schools to, among other things, notify all parents of the service dog's presence in the school, to provide expectations of conduct around the service dog for students, staff and the general public, and to provide training to all school staff and students on procedures to accommodate the service dog.

52.   Prior to Brody's arrival at school with S.B., S.B.'s parents helped prepare Collierville Schools for the arrival and implementation of S.B.'s diabetic alert service dog by providing Collierville Schools with educational and awareness information relating to how diabetic alert service dogs perform their duties of alerting to diabetic highs and lows.

53.   S.B.'s sixth grade year at Collierville Middle began well and S.B. felt safer attending school with her diabetic alert service dog beside her.

54.   Brody was very well-behaved at school and properly performed his task of alerting S.B. to blood sugar highs and lows.

55.   Despite Brody's assistance in alerting S.B. to blood sugar problems at school, S.B. experienced diabetes-related illnesses from time to time (i.e. days where she could not get her blood sugar properly regulated or was experiencing diabetic ketoacidosis) as well as battling other typical illnesses (i.e. colds, strep, sinus infections) which affect S.B. more than a typical child due to her fragile metabolic functioning and weakened immune system.

56.   In early November 2016, S.B.'s mother, R.B., communicated to Collierville Middle School's Assistant Principal, Anita Swindle, that she was becoming concerned that S.B.'s needs required more than just a 504 Plan and requested that a 504 meeting be convened so that S.B. could be considered for an Individualized Education Program (IEP) under the Individuals with Disabilities in Education Act (IDEA).

57.   Collierville Schools notified S.B.'s parents that a 504 meeting would be held on November 28, 2016 and that the school system's psychologist and Director of the Department of Exceptional Children (special education) would be in attendance to discuss R.B.'s request for S.B. to have an IEP.

58.   During the November 28, 2016 504 Plan meeting, Collierville Schools' staff informed R.B. that S.B.'s absences were negatively impacting S.B.'s academics.  R.B. responded that if Collierville Schools' believed that S.B.'s disability-related absences were negatively impacting her academic performance, then an IEP needed to be developed to provide S.B. with additional support and services.

59.   Collierville Schools answered R.B.'s request for S.B. to receive an IEP by explaining that S.B. was "too smart" and her "grades were too good" to qualify for an IEP.

12

60.     Shortly before Christmas break in 2016, Collierville Middle School Assistant Principal Anita Swindle notified R.B. that "they needed to meet to talk about Brody."

61.     Unaware of any issues with Brody, R.B. responded to Assistant Principal Swindle and agreed to meet as requested, but asked again to discuss the option of an IEP for S.B.

62.     R.B. did not receive a response or any additional follow up from Ms. Swindle and no further meeting occurred.

63.     Accordingly, S.B. returned to Collierville Middle School for the Spring Semester and proceeded normally with her sixth-grade year with her diabetic alert service dog, Brody, by her side.

**D.      Defendants' Revocation of S.B.'s Transfer Status Based Upon her Disability and Needed Accommodations Constitutes Discrimination on Account of Her Disability and Impermissible Retaliation Against Plaintiffs for their Protected Activity**

64.     Sometime in or around February 2017, and again in March 2017, school officials expressed outward hostility towards her diabetic alert service dog, Brody.

65.     Only S.B. is permitted give Brody commands, but twice Assistant Principal Tupper (the attendance principal) yelled commands at Brody in an agitated tone.

66.     Additionally, when the fire alarm went off causing Brody to bark twice, S.B.'s teacher angrily yelled at Brody to be silent.

67.     These instances made S.B. feel that there was some underlying hostility towards her diabetic alert service dog's presence.

68.     Then, in April 2017, S.B.'s parents received a truancy notice from Collierville Schools claiming that S.B.'s absences made her "truant" under the law in Tennessee.

69.     Upon receipt, R.B. immediately emailed all proof in her possession to Assistant Principal Tupper (the attendance principal) showing that almost all of S.B.'s absences were diabetes-related complications or illnesses.  Principal Tupper did not respond to R.B.'s correspondence.

70.     S.B.'s parents heard nothing further from the school or court system regarding truancy, and therefore, assumed the truancy issue had been dropped.

71.     However, on April 28, 2017, Herchel Burton, the Chief of Student Services of Collierville Schools, wrote Plaintiffs a letter which stated that S.B.'s "transfer has been rescinded because of failure to uphold the condition of the transfer" and that "no further transfer opportunities would be offered in the future."  Plaintiffs received this letter, attached hereto as **Exhibit B**, on May 8, 2017.

72.     Upon receipt of the letter rescinding S.B.'s transfer, R.B. called Mr. Burton who informed her that "his hands were tied" and that she needed to speak with Roger Jones, Principal of Collierville Middle School, because according to Mr. Burton, only Principal Jones could reverse the decision to rescind S.B.'s transfer status.

73.     On May 12, 2017, R.B. called Principal Roger Jones to discuss the decision to rescind S.B.'s transfer.  Principal Jones told R.B. that "S.B.'s rescission was final."

74.     When R.B. inquired as to why S.B.'s transfer had been rescinded (because it did not give a reason in the letter), Principal Jones told R.B. it was due to S.B.'s "poor attendance."

75.     R.B. then forwarded Principal Jones the emails she had previously sent to Assistant Principal Tupper showing how most of S.B.'s absences were diabetes-related complications or illnesses.  Principal Jones did not respond to this correspondence.

76.   Accordingly, on May 14, 2017, S.B.'s parents sent Principal Jones a detailed letter regarding S.B.'s condition and the rescission of her transfer.  Specifically, S.B.'s parents stated:

> As you are aware, my child S.B. attends 6th grade at Collierville Middle School and has type 1 diabetes.  Diabetes is a qualifying disability under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act (ADA) because it substantially limits the functioning of my child's endocrine system by preventing her body from producing insulin. Moreover, Section 504 and the ADA apply to all public schools.  As such, my child is protected against discrimination on the basis of her disability and the school must provide accommodations to ensure my child is not excluded from participation or denied the benefits of all academic and extracurricular school programs and activities.
>
> In particular, Section 504 and the ADA prohibit public schools from academically penalizing a student because of missed work, missed class time or absences that are diabetes-related.  Missed work and/or absences can result due to a number of reasons for a student who has diabetes, including because of the necessary doctor's appointments, diabetes-related illnesses or hospitalizations, and hyperglycemia (high blood glucose) or hypoglycemia (low blood glucose).
> . . .
> In fact the Office of Civil Rights has clarified that absences related to the student's disability should be excused. . . . Accordingly, I respectfully request that you re-consider these actions and ensure that my child is not penalized because of her disability.

77.   On May 16, 2017, Collierville Schools, via Principal Jones, changed course in response to S.B.'s parents' request for their daughter to be accommodated, and not discriminated against, by providing her parents with a written list of assignments Collierville Schools claimed S.B. had not turned in at that time.  Principal Jones stated that S.B. could still complete these assignments and turn them in for grading, which, of course, is an accommodation contained in S.B.'s 504 Plan.[3]

---

[3]   S.B. had already completed some of these assignments on Principal Jones list, and she did, in fact, complete and turn in the remainder of the assignments prior to the

78.   After receiving the May 16, 2017 correspondence from Principal Jones, R.B. sent Principal Jones a response expressing her confusion as to why the reasoning for rescinding S.B.'s transfer was now shifting from claiming S.B. had "poor attendance" to then claiming it was due to her "poor academics."

79.   Principal Jones responded in writing to R.B. the same day citing Collierville Schools' Policy #6.204 *Student Transfers for Non-Resident Students*,[4] which states that, "failure to provide and maintain a satisfactory academic, discipline, and attendance record may result in the denial of a non-resident application for admission." Principal Jones stated: "S.B.'s attendance was and still is the primary focus as to why her transfer was rescinded.  Her academic performance is the secondary reason.  Per our last phone conversation, my decision to rescind her transfer is final."

80.   These shifting reasons (first attendance and then academics) for the rescission of S.B.'s transfer status are merely pretext for Collierville School's discriminatory and retaliatory actions against Plaintiffs.

81.   First, S.B.'s official school record only shows seven (7) unexcused absences for her sixth-grade year (2016-2017) and at least three (3) of those unexcused absences should be changed to excused absences because S.B.'s mother provided emails to Defendants proving that the school was informed of S.B.'s diabetes-related illnesses on those days.

---

end of the quarter.

[4]      Attendance of Non-Resident Students, *available at* http://images.pcmac.org/ Uploads/TennesseeSBA/TennesseeSBA/Departments/DocumentsCategories/Document s/6204_19.pdf (last visited August 14, 2017).

82.     Moreover, S.B.'s parents believed that Collierville Middle, like her previous school, Tara Elementary, understood that per her 504 Plan, S.B. frequently had diabetes-related complications and illnesses which caused her to be late or absent to school.  Thus, S.B.'s parents did not always provide documentation in every instance S.B. was absent or late due those diabetes-related complications or illnesses.

83.     In fact, during the 2016-2017 school year, S.B. had only two (2) absences which were unrelated to her diabetes: S.B. was absent one day after returning late the previous evening from a Fall Break trip to Disney World and S.B. was absent for her grandmother's funeral.  Every other absence was related to her diabetes complications or illnesses.

84.     While S.B.'s parents generally provided documentation to the school in the event S.B. was absent, had S.B.'s parents known that Collierville Middle was going to be scrutinizing S.B.'s absences during the last month of her sixth-grade year, S.B.'s parents would most certainly have ensured that documentation excusing her absence was provided in every instance.

85.     Nevertheless, assuming that S.B. did have seven (7) unexcused absences for the 2016-2017 school year (which she did not), the policy applying to transfer students does not list a certain number of absences which trigger "unsatisfactory" attendance.

86.     Moreover, Collierville Schools knew that S.B. was a child with a disability who has more absences than children without disabilities or children with lesser disabilities. Therefore, Collierville Schools should have accommodated S.B.'s absences, not enforced a vague policy that penalized her for them.

87.     Furthermore, seven (7) unexcused absences is the same (or almost the same)

number of unexcused absences S.B. had in the two previous years during which Collierville Schools permitted S.B. to remain on transfer status without ever notifying Plaintiffs that her attendance was unsatisfactory or that her transfer status was in jeopardy.

88.     The only differences in S.B.'s attendance during the 2016-2017 year as compared to prior years in which S.B. had similar attendance statistics and remained a Collierville Schools' transfer student without incident, was that Plaintiffs advocated for S.B.'s diabetic alert service dog to attend school with S.B. and that R.B. advocated for S.B. to be considered eligible for an IEP under the IDEA.  It was only after Plaintiffs' engaged in this protected activity that S.B.'s almost identical attendance record to previous years was suddenly deemed unsatisfactory.

89.     Notably, Collierville Schools waited until the very last month of the school year to rescind S.B.'s transfer which prevented her from attempting to transfer to any other school by the Spring deadline in place for transfer applications.  *See* General Transfer Provisions, *supra* fn. 4.

90.     Moreover, had S.B.'s absences truly been the reason for the rescission of her transfer, Plaintiff should have been notified prior to the last month of school that S.B.'s attendance record was putting her at jeopardy of a rescission of her transfer.

91.     Instead, Collierville Schools took no action to alert Plaintiffs that S.B.'s transfer status was in jeopardy should she miss any additional days of school, nor did they call a 504 meeting to address her absences.

92.     Secondly, Collierville Schools' alternative, and later added justification for rescinding S.B.'s transfer, that the decision was due in part to her academic

performance, is likewise untrue.

93.     S.B.'s grades during her sixth-grade year, like her two prior years, were a mixture of A's, B's, and C's, except for one D her second semester in Math.  S.B. ended her sixth-grade year with a 2.57 GPA, not much lower than her previous years' academic performance in which Collierville Schools permitted S.B. to remain on transfer status.

94.     Moreover, Collierville Schools' Policy regarding transfer students (see footnote 4) does not contain a GPA requirement.  And just like the situation with her absences, S.B. was never notified until later correspondence between Principal Roger Jones and R.B. discussing the rescission of S.B.'s transfer, that S.B.'s grades were considered "poor" and a basis for the rescission of her transfer status.

95.     In fact, in November 2016, it was *S.B.'s parents* who requested that S.B. be evaluated under the IDEA for an IEP to receive additional supports and services, and it was *Collierville Schools* who claimed that S.B. was "too smart" and "made too good of grades" to be eligible for an IEP.

96.     Additionally, upon information and belief, there are transfer students with lower GPAs than S.B.'s who have not had their transfer status rescinded.

97.     Therefore, Collierville Schools' claim that S.B.'s academic performance was so unsatisfactory as to also warrant rescission of her transfer status is untrue.

98.     Again, the only differences in S.B.'s 2016-2017 year was that Plaintiffs advocated for S.B.'s diabetic alert service dog to attend school with S.B. and R.B. advocated for S.B. to be considered eligible for an IEP under the IDEA.

99.     S.B.'s parents have spent the entire 2017 Summer (three (3) full months)

pleading orally, in-person, and in writing, with Collierville Schools to reconsider its discriminatory and retaliatory decision to rescind S.B.'s transfer to Collierville Schools, the school system where she was previously zoned and has attended since Kindergarten.

100.  To date, and with the 2017-2018 school year now underway, Collierville Schools has maintained S.B.'s rescission of her transfer status.

101.  Collierville Schools' decision to rescind S.B.'s transfer is discriminatory against S.B. because of her disabilities.  The rescission is also retaliatory for Plaintiffs' advocacy for S.B.'s legally protected federal rights, as well as the important rights of all children with Type I diabetes who require accommodations at school, including but not limited to having a diabetic alert service dog attend school.

102.  Collierville Schools' decision to rescind S.B.'s transfer was in violation of her federally protected rights under Section 504/ADA and caused S.B. great harm—psychologically and socially to remove her from the school system and peers she has been with since Kindergarten.  The rescission of her transfer has also caused a great deal of emotional and financial stress to S.B.'s parents.

## IV. <u>CAUSES OF ACTION</u>

### <u>COUNT ONE</u>: 29 U.S.C. § 794 DISCRIMINATION & RETALIATION IN VIOLATION OF SECTION 504 OF THE REHABILIATION ACT OF 1973

103.  Plaintiffs reallege each paragraph above as if fully set forth herein verbatim.

104.  Collierville Schools has acted with deliberate indifference, bad faith, gross misjudgment and/or with intentional discrimination[5] to the rights of S.B. secured by

---

[5]     While Plaintiffs contend throughout that Defendant's action certainly rise to the

Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 and 34 C.F.R. § 104.4, by:

    a)    Subjecting S.B. to discrimination in violation of 34 C.F.R. § 104.4(a);

    b)    Denying S.B., because of the nature and severity of her disabilities, the opportunity to participate in and benefit from federally assisted education services, programs and activities, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(i);

    c)    Subjecting S.B. to discrimination on the basis of the nature and severity of her disability, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(a); and

    d)    Using criteria or methods of administration that have the effect of subjecting S.B. to discrimination on the basis of disability, in violation of 34 C.F.R. § 104.4(b)(4).

105.  Collierville Schools acted with deliberate indifference, bad faith, gross misjudgment and/or with intentional discrimination to S.B.'s rights under 504 by discriminating against S.B. on the basis of her disability and needed accommodations

---

level of intentional actions/inactions, hence why they are pled as such, recent authority from the Eastern District of Tennessee has clarified that intentionality is not required to prove damages under Section 504 and Title II of the ADA. *I.L. v. Knox Cty. Bd. of Educ.*, 2017 U.S. Dist. LEXIS 92257, *46 (E.D. Tenn. June 15, 2017) (internal citations omitted) ("There is nothing to indicate that a plaintiff must ever prove intentional discrimination—or deliberate indifference—under Title II and § 504. What's more, the Supreme Court has upheld a damages award in a Title II case involving no intent element. And while eight courts of appeals require some mental state before awarding damages under Title II and § 504, these decisions have misconstrued Supreme Court case law. Taylor need not show that the Department of Education acted with deliberate indifference to win damages. So she need not show it to win an injunction."

(i.e. her diabetic alert service dog and disability-related absences) in denying S.B.'s continued transfer status for the 2017-2018 school year.

106.    Further, the rescission of S.B.'s transfer status occurred only after her parents' advocacy for her federally protected rights to have a diabetic alert service dog attend school with her and after S.B.'s mothers' repeated requests for Defendant to consider developing an IEP to provide additional supports to S.B.   Accordingly, Defendant's rescission of her transfer status was deliberately indifferent and in retaliation for Plaintiffs' exercise of their rights on behalf of children with a disability in violation of Section 504.

107.    Plaintiffs seek monetary damages from Defendant to include all out-of-pocket expenses including the homeschooling Plaintiffs were forced to undertake for the 2017-2018 school year, damages suffered, out-of-pocket expenses, and damages for the emotional distress including physical manifestations of that stress, humiliation, and embarrassment suffered by S.B., and her parents, due to Defendant's deliberate actions and inactions.   They also seek their attorneys' fees and costs as well as injunctive relief to prohibit further discrimination against S.B. in the future.

### COUNT TWO: 42 US.C. § 12131 DISCRIMINATION AND RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990 WITH AMENDMENTS 2009

108.    Plaintiffs reallege each paragraph above as if fully set forth herein verbatim.

109.    Title II of the ADA covers programs, activities, and services of public entities.

110.    Collierville Schools is a public entity because it is a state or local government or a department or instrumentality of a State or local government.

111.    Collierville Schools had knowledge of S.B.'s disabilities entitling her to protection

under the ADA.

112.   Title II of the ADA prohibits discrimination against any "qualified individual with a disability."  It also prohibits retaliation against persons with disabilities, or persons who advocate on behalf of a student with a disability's rights to education.

113.   Collierville Schools has intentionally, purposefully and/or with deliberate indifference violated the rights of S.B. secured by the Americans with Disabilities Act of 1990 with Amendments, 42 U.S.C. § 12131 *et seq.* and 28 C.F.R. § 35.130, by:

a)  Subjecting S.B. to discrimination in violation of 28 C.F.R. § 35.130(a);

b)  Excluding S.B. from participating in and denying her the benefit of Defendant's services, programs, and activities on the basis of her disability, in violation of 28 C.F.R. § 35.130(a);

c)  Using criteria or methods of administration that have the effect of subjecting S.B. to discrimination on the basis of her disability, in violation of 28 C.F.R. § 35.130(b)(3)(i); and

d)  Refusing to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, in violation of 28 C.F.R. § 35.130(b)(7).

114.   Collierville Schools acted with deliberate indifference, bad faith, gross misjudgment and/or with intentional discrimination to S.B.'s rights under 504 by discriminating against S.B. on the basis of her disability and needed accommodations (i.e. her diabetic alert service dog and disability-related absences) in denying S.B.'s continued transfer status for the 2017-2018 school year.

115.   Further, the rescission of S.B.'s continued transfer status to the only school

system she has ever known since Kindergarten occurred only after her parents' advocacy for her federally protected rights to have a diabetic alert service dog attend school with her and after S.B.'s mothers' repeated requests for Defendant to consider developing an IEP to provide additional supports to S.B.

116.   Accordingly, Defendant's rescission of her transfer status was deliberately indifferent and in retaliation for Plaintiffs' exercise of their rights on behalf of children with a disability in violation of the ADA.

117.   Plaintiffs seek monetary damages from Defendant to include all out-of-pocket expenses including the homeschooling Plaintiffs were forced to undertake for the 2017-2018 school year, damages suffered, out-of-pocket expenses, and damages for the emotional distress including physical manifestations of that stress, humiliation, and embarrassment suffered by S.B., and her parents, due to Defendant's deliberate actions and inactions.  They also seek their attorneys' fees and costs as well as injunctive relief to prohibit further discrimination against S.B. in the future.

## COUNT THREE: 42 U.S.C. § 1983 RETALIATION IN VIOLATION OF THE FIRST AMENDMENT

118.   Plaintiffs reallege each paragraph above as if fully set forth herein verbatim.

119.   Title 42 U.S.C. § 1983 of the United States Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory . . . , subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

120.   The First Amendment protects any citizen from reprisal as a result of speech on

a matter of public concern.  Speech involves matters of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder* v. *Phelps*, 562 U. S. 443, 131 S. Ct. 1207, 1211 (2011) (citation omitted).

121.   Plaintiffs engaged in protected activity under the First Amendment when they requested accommodations for S.B., including the attendance of her diabetic alert service dog.   Plaintiffs further engaged in protected activity under the First Amendment when they provided assistance to develop a procedure/plan to allow S.B.'s diabetic alert service dog's attendance on school grounds and when they provided education and training to teachers and staff regarding symptoms and treatment of Type I diabetes and how diabetic alert service dogs perform their duties to assist individuals with Type I diabetes.

122.   With Type I diabetes on the rise in youth under age 20, educating and informing school officials on the symptoms and treatments for Type I diabetes, including advocating for the use of an important and life-saving accommodation to be provided like a diabetic alert service dog, Plaintiffs engaged in legally protected speech on matters of important public concern.

123.   In response to Plaintiffs' aforementioned legally protected concerns under both the First Amendment and Section 504 as well as the ADA, Defendant, acting under color of state law to deprive Plaintiffs of their rights secured by federal law, did engage in a pattern of retaliation against Plaintiffs either from a policy or custom or undertaken by employees with final policymaking authority of indifference to the rights

of children with disabilities, including Type I diabetes.  Said pattern of retaliation was in bad faith, taken in deliberate indifference to Plaintiffs' rights.

124.    Moreover, the adverse action of rescinding S.B.'s transfer to continue attending Collierville Schools would certainly deter a person of ordinary firmness, and the rescission was causally connected to the protected conduct identified above as it was done only after Plaintiffs' engaged in the protected activity.

## V.  RELIEF REQUESTED

WHEREFORE, PREMISES CONSIDERED, Sc.B., R.B., and S.B. respectfully request that this Court award the following relief:

A.    Finding that Collierville Schools discriminated against S.B. based upon her disability by rescinding her transfer to Collierville Schools in violation of Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act;

B.    Finding that Collierville Schools impermissibly retaliated against Plaintiffs by rescinding her transfer to Collierville Schools in violation of Section 504 of the Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act, and 42 U.S.C. § 1983 First Amendment to the United States Constitution;

C.    Injunctive relief enjoining Collierville Schools from continuing to rescind S.B.'s transfer to Collierville Schools permitting her to return to Collierville Schools as soon as possible;

D.    A permanent injunction enjoining Collierville Schools from any further retaliation against Plaintiffs;

E.    Awarding Plaintiffs declaratory, equitable, nominal, and compensatory damages relief for violations of the United States Constitution, Section 504 and the ADA;

F.    Awarding prejudgment interest at the maximum rate permitted by law on all sums awarded;

G.    Awarding Plaintiffs their reasonable attorneys fees and costs; and

H.    Awarding such other relief at law or equity which may be deemed appropriate.

Respectfully submitted,

**THE SALONUS FIRM, PLC**

/s *Jessica F. Salonus*
JESSICA F. SALONUS (28158)
139 Stonebridge Boulevard
Jackson, Tennessee 38305
Telephone: (731) 300-0970
jsalonus@salonusfirm.com

*ATTORNEY FOR PLAINTIFF*